May I proceed? Thank you, Your Honor. Good morning, Your Honors. Learned Counsel for the Government. My name is David J. Bernstein. I'm here on behalf of Sylvia Walter-Eze, seated to my left is my assistant, Ileana Aiedo. May it please the Court. The government would have you believe that this is a garden-variety, ineffective assistance of counsel claim and shouldn't even be before this august body. It should be the subject of a 2255 back in the district court. That couldn't be further from the truth, Your Honors. This is a very unique situation. There is a direct conflict, certainly, between counsel and Ms. Walter-Eze, but the conflict was created by the trial court. Ms. Walter-Eze was being represented by an attorney named Peter Swarth. He had a lot of trouble getting ready for trial. He requested one continuance along with the government, a second joint continuance with the government, a third joint continuance with the government, and by the time he got to the fourth continuance, Ms. Walter-Eze had come to the conclusion that he was not up to the task, and she fired him, and she hired Christopher Darden and Oma Nicali. At the first appearance, Mr. Swarth had submitted a document for substitution of counsel, and at the very same time, just in case that motion was denied, he submitted another motion for continuance of 90 days. So Ms. Nicali and Mr. Darden are before the court, and they've just come on board. They know virtually nothing about the case, and they are not ready to go. So the trial judge gave them a brief continuance, and Ms. Nicali was suffering from the aftereffects of a serious accident, and she was in chronic pain and had been told by her doctor that she needed surgery. And she was putting off the surgery so that she could work on this case. And on February 18th, I believe it was, they came before the court. Does it make any difference that the district court viewed the attempt at the last-minute continuance as a delaying tactic? And the court emphasized, look, if you're not ready, don't try the case. Do those factual findings and the district court's perspective as to what was going on in the attempts to push this case beyond what counsel had represented previously? Because when they came into the case, there were representations made that they would be ready for trial. And so the court permitted the continuance, and then on the eve of trial, they tried to push it off. So to what extent do we look at those factual findings made by the district court? Well, that's an excellent question. The court did, in fact, say on a couple of occasions that he believed that Mr. Swarth's continuances were dilatory. But he never had a hearing on it. He never made findings of fact. He just basically jumped to a conclusion that it was his gut instinct that Mr. Swarth's behavior was dilatory. And at some point ---- Why would you need to have a hearing on that? I'm sorry, Your Honor. Why would you need to have a hearing on that? I mean, it happens routinely, it seems to me, in district courts where the trial judge can say, look, you've been delaying this too long. I've got to get set for trial. I don't think we need to require a hearing every time they do that. Well, Your Honor, this Court said in 1985 in United States v. Studley that there are four considerations that need to be considered when the question of a continuance is before the court. We have nothing in the record that this trial court actually observed what was required by Studley. Would the Court like me to go into those conditions? I guess I'm more interested in a practical question because this is an issue faced by trial judges all the time where there's a last-minute change of counsel and it happens once or twice or three times. At what point does the trial court have the right to go forward and just say we're going to try this case? Well, Your Honor, our position is that the most important consideration before the court was the appellant's Sixth Amendment rights. The court had concerns about moving its calendar forward. The court had concerns about reimbursing the government for the jury that had been empaneled. Why aren't those legitimate concerns that the district court should have? I mean, this case started with a trial date in July of 2014 and we're eight months later, three the court had granted three continuances. On the day, the very day of trial, they come in and ask for yet another continuance. Well, Judge. The jury is there and, you know, has to be paid. Why aren't these considerations that a trial court legitimately has and can make decisions on? Well, basically, Judge, the court can do whatever it likes. Well, I should have added appropriately make decisions on it. But the question is, is this court needed to do a balancing test? The court needed to balance the considerations of the amount of money and the moving its trial. But these very counsel had promised the court in February that they would be ready and that was the basis on which the court let them substitute in. They said they would be ready. They come, you know, the day of trial and ask for more time. And ultimately, the judge does give them, he gives them at least two days. I realize that you're concerned about the choice that the trial court put him to. But they had the option of getting a longer adjournment. He was given two days to get familiar with that portion of the case that his colleague contended she couldn't prepare. Okay. Judge, basically, Mr. Darden and Ms. McKellie were hired about ten days before they had to go to trial. And there were 23,000 pages of discovery that were given to them. Mr. Swarth hadn't gone through it. He was not able to hand off the case in any state of preparation. But they told the court they could be ready when they came in. They told the court that they could be ready. That's because, well, first of all, Judge, at that point — Because it wasn't true? I mean, did they misrepresent it? I don't believe they misrepresented. Judge, I think they were overambitious and overly optimistic about what they would be able to accomplish in a short period of time. And then suddenly they found that they were faced with 23,000 pages. And while the government might say we only had 76 exhibits, well, if those exhibits consisted of hundreds of pages, it was a tremendous job that had to be done. Mr. Swarth was unable to do it in four continuances. And suddenly, you know, they were hired, Mr. Darden and Ms. McKellie. They were hired. But on the final day of trial, then this colloquy occurs and there's an adjournment. And then the attorney comes back and says, look, I can try this case if you give me two days. So what's the error in accepting that representation on that day? Here's the problem, Judge. Ms. McKellie was completely candid with the court. And she said, Judge, we are not ready. We cannot go forward. And then the judge turned his attention to Mr. Darden. And Mr. Darden said, wait a minute, wait a minute, wait a minute. I have other considerations. I have a family to feed. I think, you know, he was asking for the continuance. The judge was continuing to refuse. And they began to bargain. The judge said, I'll give you a continuance to April 28th, but only if you agree to pay for this jury and to pay the costs for the government's witness and, as this were, the amount of $1,000, there has to be a voluntary reporting to the California State Bar. And the judge said we were not ready. But, you know, the judge said, wait a minute, wait a minute. I have other considerations. And here's the problem, Judge. The judge was continuing to refuse. And the judge said, wait a minute, wait a minute. I have other considerations. I think, you know, the judge was continuing to refuse.  Is there a reason for this refusal to pursue? Yes. There absolutely was a very reasonable probability. Mr. Darden was not prepared. He had no witnesses other than the appellant. He needed time to subpoena witnesses. But specifically, I didn't see arguments made in the briefing that if he had time and subpoenaed the witnesses, what they would have said that would have changed the verdict in the case. Well, to some degree, Your Honor, he didn't know. He needed to do investigation and didn't have the opportunity to do it. But he did say that Mr. Swarth had done nothing. He hadn't subpoenaed witnesses. He hadn't done depositions. He hadn't prepared any paperwork. He hadn't worked on jury charges. He had no time to do anything.   And the reason for that is nothing. So they came into the case, and they really didn't know what they were stepping into. Your Honors, may I reserve what's left of my time for rebuttal? Go ahead and answer the question. I really want to know what your answer is to this question of prejudice, because you said he did nothing, and so, therefore, he didn't know if there could be something out there that's helpful enough to change the verdict. But at this point, you're on appeal. Don't you have to point to an error by counsel and say, if only he had reached out to this particular witness, she would have come into court and would have testified to this, and that's how it would have changed the verdict? That's the second part that's missing from the arguments in the briefs. May I answer that, Your Honor? Please. I think the analysis is very simple, and it begins and ends here. Ms. McKellie said, we are not ready. Judge, we are not ready. And then the judge went to Mr. Darden and tried to bully him into going to trial. And that's what happened. And they went to trial when we already knew and the court already knew, based on what Ms. McKellie had told him, that they were not ready. What is the nature of the conflict? You say there was a conflict of interest here. Are you contending that this was, under Kyler, an actual conflict where prejudice is presumed, or are you not making that argument? I am making that argument, Judge. It was an actual conflict, and prejudice was presumed because Mr. Darden was afraid that he was going to get a sanction that was going to be reported to the bar, and it would hurt his career. And so basically under that level of duress, he thought it was better to go to trial unprepared at the expense of my client, which is what he did. Thank you, counsel. We will give you some time for rebuttal. Thank you. May it please the Court, Ellen Meltzer for the United States. Contrary to what Mr. Bernstein just stated, there was no actual conflict of interest in this case that was created by the district court judge. Why not?  could not be held accountable. either you go to trial, in effect, unprepared, or, you know, you're going to have to pay this, you face sanction. I'll give you an adjournment which would be helpful to your client, but it's going to hurt you. You're going to have to pay for the jury, and you face a potential sanction. So why isn't that a conflict position that counsel was placed in by the court itself? Because your suggestion is that every single time that the court decides to impose fees or costs or some type of sanctions, then that attorney can no longer be involved in the case. And I don't think that that's true. What was suggested even though, I think the question is one of choice. I mean, we have award of fees or sanctions or whatever. But in this case, it was you pay the money or you don't get the continuance. Why doesn't that make it different? Because initially Mr. Darden said that he would accept the costs and would go, you know, would have the continuance. But he started talking about his family. I mean, that certainly would indicate to me he's got more than his client on his mind. Yes, he did, Your Honor. But I think that any conflict or any potential conflict. And his reputation, correct? Yes, Your Honor. But any potential conflict was eliminated first. Why is it potential? Why is it actual at that moment? He's given him the choice, the choice between his own welfare as a lawyer and his clients. Because a conflict only becomes an actual conflict when there's an adverse effect on counsel's Well, the adverse effect is he could have gotten a continuance where he could have been more prepared and he chose not to. Your Honor, he was a lot more prepared than defense counsel has represented. Contrary to what they represented in their brief, both counsel were certainly familiar with all of the government's exhibits. They did submit jury instructions. There were joint jury instructions submitted. In addition, Ms. McKellie submitted two sets of her own instructions under Docket Entry 129 and Docket Entry 138. So you're saying the claim before the judge that they weren't ready was one that was disingenuous? I don't think it was disingenuous, Your Honor. I think that on March 10th, when they came into court and thought that they were going to proceed for trial, Mr. Darden and Ms. McKellie were certainly not as prepared as they could have been or they might have been or they would have liked to be. But Mr. Darden made a representation to the court that day that they would go ahead and pick the jury and he would be prepared and know Ms. McKellie's part of the case on March 12th. Didn't Ms. McKellie end up trying the case or being present? Yes, she did. So she was there and present. She was, and despite the representations that she had made to the court that she couldn't sit for more than 30 minutes and she was in dire pain, she went forward, she tried the case, she didn't ask for any type of accommodations, and the case proceeded. A lot of the cross-examination in the case was extremely skillful. Mr. Darden is a very talented lawyer. They did proceed with openings, with closings, making objections, many of which were sustained. Ms. McKellie, prior to the trial starting, did oppose several of the government's motions that eliminate. She submitted two of her own. It's not like they did absolutely nothing. They just sat there during the trial. If I might interrupt, in their brief, here's what they say. Throughout the trial, there was substantial evidence of counsel's unpreparedness to proceed with trial, including but not limited to not having reviewed all the government's exhibits, not having prepared the jury instructions, failure to complete their PowerPoint presentation and having it stricken, failing to secure the attendance of witnesses of trial, and failing to provide the government with a list of experts and witnesses in a timely manner. Are those all true? Not the first several, Your Honor. It is true. How do you know they reviewed all the government's exhibits? Well, they certainly made use of them during the trial. I mean, they used them to cross-examine the government's witnesses. Right. What they say is they didn't review all of them. I don't know whether that's true or not. But assuming all those are true, was the PowerPoint presentation stricken? Yes, it was, Your Honor. And were the expert witnesses stricken because they weren't timely provided? They had not given Rule 16 disclosure to the court, so they were told that they could not put on an expert. And did they have an expert ready? Not that I know of. Okay. But the fact is, in terms of what Judge Wynn asked before about prejudice, they haven't made any showing, either in the lower court or to this court, that they would have done anything differently if they had more time to prepare. Well, it sounds like they would have finished their PowerPoint presentation. That was for a closing argument, Your Honor, and I don't know how effective something like that is anyway. Sure, that might have been used. They might have had an expert witness. I don't know. I've never seen an expert witness in any Medicare fraud case like this that that was effective in any way. Why isn't prejudice presumed in this case? Excuse me? Why shouldn't prejudice be presumed? Because the Supreme Court made very clear in Mickens v. Taylor that lower court should not extend Kyler v. Sullivan to cases beyond joint representation. And if there's any case where it shouldn't be extended, where the government's evidence is overwhelming, it's this case where it would be inappropriate, Your Honor. The court in Mickens stated unambiguously that courts, including this one, and it cited two cases from this court, had unblinkingly extended Kyler to cases that did not involve joint representation. And it was very critical of those kinds of situations. But did Mickens actually hold that prejudice could be presumed only in joint representation cases? Was that the holding of that case? It left open the question whether prejudice could be presumed in In other types of cases, correct? Other than joint representation. That case involves successive representation. And there's one reported case from this court post-Mickens where it did extend it in a successive representation case. But there are no reported cases from this court where it's been extended to cases involving personal interests or financial interests or personal professional interests of defense counsel. What the court said in Mickens is that nothing in Sullivan established or even supported its extension beyond joint representation cases. And we're not arguing that Ms. Walterese would never have a forum for her complaints about counsel. But we believe that it's more appropriate that it be done in a 2255 situation. It doesn't mean that this court can't later examine Ms. McKinley's conduct and Mr. Darden's conduct, but it should be done under a Strickland analysis. Let's assume for the sake of argument, just hypothetically, that we were to hold that prejudice would be presumed. Who would be the government's response as the next step in the analysis? Is that the end of the story? The court would have to decide whether or not when Mr. Darden said that he would be ready in two days, whether the district court had a right to rely on his good faith and on that representation, and whether or not that had eliminated any conflict. I think your argument was, I mean, we start with the presumption of prejudice, but that presumption may be rebutted, correct? Excuse me, Your Honor? If we start with the presumption of prejudice, it necessarily means the presumption may be rebutted. Exactly. And what would the government's position be on presuming prejudice, how that would be rebutted in this case? By the overwhelming evidence that the government had, that the outcome of the proceeding would not have been different because of the substantial evidence of the egregious fraud that Ms. Walterese and her company, Escor, engaged in, in terms of paying kickbacks to recruiters, to have Medicare beneficiaries who had no medical necessity for a wheelchair accept them, to the fact that not only was she paying recruiters, she was paying doctors kickbacks. You know, $3.5 million were billed to Medicare for not only power wheelchairs, but other types of durable medical equipment that was not necessary. And I think the government's evidence on that was absolutely overwhelming. She admitted that she was familiar with Medicare regulations, that she had taken courses, that she had training, and she knew that she could not pay kickbacks, and yet she was paying them under the guise of what she called a commission salary. She had a sheet where she listed how much would be paid for every type of DME, and the ones where she paid the most were for hospital beds and for wheelchairs, and those are the ones where a durable medical equipment company, a supplier gets the most money back from Medicare. I mean, she knew what she was doing was wrong, Your Honor. They're ‑‑ excuse me. So I realize that your position is that this should be pursued in a 2255, but if we presume prejudice, the government's position is that there's no prejudice because of the evidence, in a nutshell. There's no prejudice, yes, because of overwhelming evidence. She saw ambulatory people at her business, and then later that day or the next day a prescription would come in for a power wheelchair, and she went ahead and she billed that to Medicare. It's ‑‑ she told her delivery person, Mr. Aguilar, that it didn't matter whether or not the power wheelchairs fit in somebody's house. It didn't matter whether or not they could use them. It didn't matter if it even was delivered inside the house, and sometimes it was left in a garage or it was left on a lawn. She didn't care at all, Your Honor. She only cared in making money, and I think that the government's evidence in this case would overcome any presumption of prejudice. Any further questions? No. Thank you, Your Honor. Thank you. Rebuttal, and we'll put five minutes on the clock. Thank you, Your Honor. First of all, I take issue with the characterization of the government's evidence being overwhelming. At the end of the day, the government basically looked at four individuals, four patients. They were able to get convictions on three of them. So 25% of their indictment failed. Ms. Meltzer says that she charged $3.5 million to Medicare. This is true. But there was an agent who testified that only 47% of her business was in power wheelchairs, like the one I'm sitting in. And there was no testimony about the other 53%, because the government made a motion in limine that there could be no evidence presented about her legitimate business dealings, and the judge upheld that objection. So, and then the question becomes that there is, and this is a question we raised in our brief, of how much of the loss should be attributed to Ms. Walter E. Zee. And the government attributed $3.5 million, which is everything that she billed to Medicare during the period in question between 2007 and 2012, I believe. And there was no investigation, there was no evidence in front of the court about what consisted or rather what the difference between 3.5 and 1.9, 1.9 of course being the amount that was actually received by Ms. Walter E. Zee. There, the court never heard evidence about what the difference was between the 1.9 and the 3.5. So there may very well have been a large portion of her business that was legitimate, but because of the motion in limine, the court never heard that evidence. This, this particular. Those are in connection, those arguments are really in connection with your sentencing claims, correct? Yes. And although the court had a motion in limine with regard to the trial itself, there was nothing that precluded her at the sentencing phase of the trial from putting on evidence that a substantial portion of her business was legitimate, correct? That, that's a good point, Your Honor, and I would attribute that to the fact that her lawyers simply weren't prepared. Well, they had a lot of time from this point to the point of sentencing. Her sentencing was three months after the trial, correct? You can't say that the original decision of making them go to trial in March had anything to do with how prepared they were at sentencing. They had three months to figure that question out, correct? They, they would have, Your Honor, yes. And there was also other testimony that other items other than power wheelchairs were the subject of these kickbacks, items that were related, beds, I believe, a few other items. It wasn't just the power wheelchairs, correct? Actually, this case dealt primarily with the power wheelchairs. There were, I believe, a few hospital beds thrown in there, too. But, but, but certainly Ms. Walter-Easy only received $1.9 million from Medicare. There was testimony that, well, from one agent who said Medicare pays 80 percent of whatever is billed, which I don't believe is correct. But in any case, there was other testimony that Medicare has a schedule that they pay out for every single item. So Ms. Walter-Easy knew that she was not going to get 100 percent of, of the 3.5, certainly. And you're basing that contention on testimony at trial from an agent that they didn't reimburse 100 percent? Is that what the basis for her knowledge is? Because she never testified to that either at trial or at sentencing, correct? It's, it's, it's the basis of my knowledge. Well. It's in, it's in the transcript. The, the government agent testified that, that Medicare only pays 80 percent. And, and also I believe the, the schedule for Medicare and Medi-Cal, what they will pay for any given item, was put into evidence. And finally, the, the judge and the probation department and the PSR apparently used the numbers in, in two exhibits that were placed by the government, 11 and 12, which basically were in the nature of summaries created by the U.S. Attorney's Office. And the judge took the number and he used it to sentence her. And it wasn't the right number, Judge. And was that contested at the time that it wasn't the right number? Unfortunately, no. And I, I attribute that again to the fact that counsel wasn't prepared. Thank you, Counsel. Thank you, Judge. The case just argued will be submitted for decision. Thank you.
judges: Thomas, Nguyen, Amon